UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRETT ROBERTS,

    Plaintiff,

    v.

DAYMON WORLDWIDE INC., et al.,

    Defendants.

Case No. 15-cv-00774-WHO

**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

Re: Dkt. No. 22

## INTRODUCTION

Plaintiff Brett Roberts alleges that defendants Daymon Worldwide Inc. and Omni Global Sourcing Solutions, Inc., his former employers, wrongfully terminated him in order to avoid paying transition and earn-out payments. Defendants argue that Roberts was not entitled to transition or earn-out payments because he was terminated for cause for ordering the destruction of export documents, which constituted a material violation of law. Roberts claimed in his briefing and at oral argument that he did not destroy all copies of the documents at issue, but he failed to make that allegation in his complaint and so defendants' motion is GRANTED. It seems possible that, depending on the not yet alleged facts, the destruction of documents was not a violation of law or not a material violation of law, and therefore not sufficient cause for his termination. Accordingly, Roberts shall have LEAVE TO AMEND to allege the basis to establish that the destruction of the certificates did not constitute cause.

## BACKGROUND[1]

Roberts alleges in his complaint that in 1989, he founded the Omni Pacific Company, Inc., a multinational food and beverage export business. Compl. ¶ 7 [Dkt. No. 1]. After growing the company for 16 years, he decided to sell Omni Pacific. *Id.* ¶ 8. On August 15, 2012, defendant

---

[1] I take the allegations in the complaint as true when considering defendants' motion to dismiss.

Daymon purchased Omni Pacific's assets along with Roberts's goodwill in the company. *Id*. ¶ 10. In recognition of Roberts's "outstanding efforts" in building Omni Pacific and becoming a leader in the business, Daymon offered Roberts a full-time position as Senior Vice President of a new division called Omni Global, pursuant to a five-year employment agreement. *Id*. ¶ 11.

As Senior Vice President of Omni Global, Roberts received a starting base salary of $175,000 and incentive bonuses. *Id*. His base salary for 2014 was $195,000. *Id*. ¶ 56. Per his employment agreement, if Roberts was terminated "other than for Cause," defendants were required to pay Roberts "transition payments" equaling 12 months of his base salary. *Id*. Roberts was also "entitled to annual performance-based earn-out payments up to a total remaining balance of $400,000," if his employment was terminated "other than on account of 'Cause.'" *Id*. ¶ 57. The employment agreement defines "cause" as:

> (i) an act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of your employment with company;
>
> (ii) intentional damage to companies [sic] assets;
>
> (iii) Intentional disclosure of company's confidential information contrary to companies [sic] policies;
>
> (iv) breach of your obligations under this agreement;
>
> (v) intentional engagement in any competitive activity which would constitute a breach of your duty of loyalty or of your obligations under this agreement;
>
> (vi) intentional breach of any of company's policies;
>
> (vii) the willful continued failure to substantially perform your duties for company (other than as a result of incapacity due to physical or mental illness);
>
> (viii) or willful conduct by you that is demonstrably and materially injurious to company, monetarily or otherwise.

*Id*. ¶ 58.

As Senior Vice President, Roberts "worked long hours to make the purchase transition go well for the benefit of all employees, customers, and the Companies." *Id*. ¶ 13. His efforts paid off. In 2012 and 2013 he achieved the highest annual "target incentive award," which earned him

a bonus of 40 percent of his salary. *Id.* ¶¶ 13-14, 23. In 2013, he received a favorable annual performance review from his manager and supervisor, including the following remarks:

> Brett [Roberts] and the team did an incredible job in attaining the 2013 budget numbers. I am very proud of the team, their hard work, dedication, and commitment.
>
> (. . .)
>
> I am really proud of Brett and the team for their 2013 performance and am confident this success will roll into 2014 and beyond. We have some tweeking [sic] to do, but the sky is the limit and I know Brett and the team believes [sic] this as well . . . Thank you Brett!

*Id.* at ¶¶ 14–16 (final ellipses in original).

Despite his successes and positive review, Roberts was concerned with defendants' handling of the trading department. He felt that they were not "maintaining a smart, sustainable approach to the trading department," and that their practices were "hamstringing" the department. *Id.* at ¶ 20. In his 2013 annual review, he wrote that the trading department's gains were achieved "despite many HR problems and [being] short staffed." *Id.* at ¶ 18. When he presented his complaints to the defendants' HR and legal departments, he received "increasingly dismissive and annoyed responses." *Id.* ¶ 22.

In January 2014, Daymon retained the firm of King & Spaulding ("K&S") to conduct a compliance audit of the trading department. *Id.* ¶¶ 23-24. On January 8, 2014, the audit team met with Roberts to ask him about basic business processes, procedures, and transactions, and accounting, legal, and ethical issues. *Id.* ¶ 25. The next day, the audit team met with Roberts, his supervisor, Larry Becker, and Daymon's in-house attorney, Cindy Cheng, to present their initial findings. *Id.* ¶¶ 25-26. The audit team reported that the trading department had "really great," "dedicated," and "hardworking employees" overall and that the department's processes, procedures, and recordkeeping were "quite good." *Id.* ¶ 26.

At the meeting, the audit team raised three documentation issues it had discovered. First, the inland trucking costs for certain export shipments should have been included into valuation calculations. *Id.* ¶ 28. No action was necessary on this issue, but the department should follow

the audit team's recommendation moving forward. *Id.*  Second, additional diligence was needed to document the origin of an export item to meet the applicable rules of origin under the U.S.-Korea Free Trade Agreement. *Id.* ¶ 29.  Again, it was agreed that no action was necessary on this issue, except to follow the audit team's recommendation moving forward. *Id.*  The third issue involved an employee (a trader) responsible for Korean customers, who had signed several certificates of origin on behalf of a U.S. manufacturer on the manufacturer's letterhead. *Id.* ¶ 30.  The trader admitted signing the certificates, but assumed it was permissible to do so because he had the manufacturer's consent. *Id.* ¶ 36.

Roberts was not aware that the trader had been doing this and was shocked. *Id.* ¶¶ 31-32, 35.  In Roberts's experience, signing a manufacturer-issued certificate was "not something a trader ever did," and he expressed that had he known about this, he would have put an immediate stop to it. *Id.* ¶¶ 31, 35.  When an auditor asked Roberts why he thought the trader had done something wrong, Roberts responded, "You can't create documents under someone else's name or letterhead.  I would think it might even be a form of forgery." *Id.* ¶ 33.  The auditor asked if Roberts had obtained legal advice in that regard, and Roberts said, "No, I just know that it's wrong." *Id.* ¶ 34.

Unlike the other two documentation issues that were raised, the audit team did not make a recommendation as to what to do about the certificates. *Id.* ¶ 36.  Becker (Roberts's supervisor) and Cheng (Daymon's in-house attorney) likewise did not offer their opinions. *Id.*  Roberts asked what he should do, but "[n]o one responded with a direct order for [him] to follow." *Id.* ¶ 37.  The conversation turned to other topics. *Id.*  When Roberts tried to raise the subject again and offered to "take care of the situation," Becker merely stated that they wanted to be sure this never happened again. *Id.* ¶ 38.  No one suggested that the trader be terminated, suspended, or disciplined, or that the certificates should be sequestered or retained. *Id.* ¶ 39.  Roberts was therefore led to believe that the matter was left to him to "fix and move on." *Id.* ¶ 40.

The next morning, Roberts met with the trader individually. *Id.* ¶ 41.  The trader explained that the first time he had requested a signed certification from the manufacturer, there had been such a delay in receiving the signature that the goods were forced to wait in a container for over ten days, inconveniencing and infuriating the customer. *Id.*  Consequently, to avoid future delays,

4

the manufacturer provided the trader with a blank copy of the manufacturer's letterhead, and consented to the trader filling out and signing future certificates on its behalf. *Id.* ¶ 42. The trader thought this practice was permissible because he had the manufacturer's consent and he was signing his own name. *Id.*

Roberts was satisfied that the trader signing the certificates was "no harm, no foul" because the manufacturer had expressly consented and had not complained about the trader's practice. Roberts still believed the trader's actions were impermissible, however, reprimanded him and warned that if he ever did it again he would be fired. *Id.* ¶¶ 42-44. Roberts instructed the trader to shred any hard copy certificates in the contract files and delete any electronic copies found on the trader's personal computer. *Id.* ¶ 45. To help the trader avoid workplace gossip and embarrassment, Roberts told the trader to shred the documents on a Saturday. *Id.* The following Monday (January 13), the trader confirmed to Roberts that the certificates —about a dozen in total — had been destroyed. *Id.* ¶ 46.

On January 14, Roberts reported to Cheng and a K&S audit member that he had spoken to the trader, reprimanded him, and instructed him to destroy the certificates that had been signed. *Id.* ¶ 47. At the time, no one questioned Roberts's handling of the situation. *Id.* ¶ 48. The audit continued and no further issues were presented to Roberts. *Id.*

More than a month later, on February 28, 2014, Roberts was working at a tradeshow in Dubai when he was ordered to "immediately" return to Walnut Creek. *Id.* ¶ 49. On March 7, Roberts was questioned for an hour and a half about his instructions to the trader to destroy the certificates. *Id.* An audit team member suggested that Roberts's instructions had been improper and unethical. *Id.*

The following Monday, March 10, 2014, Daymon's Director of HR Business Partner & Recruiting, Clint Sollenberger, told Roberts he was being terminated for cause for "violating the company's document retention policy" by instructing the trader to destroy the certificates. *Id.* ¶ 54. An hour later, Roberts's wife was also terminated because of her close personal relationship with Roberts. *Id.*

Roberts contends that his "for cause" termination for ordering the trader to destroy the

certificates was a mere pretext and that defendants' real reason for his termination was to "cheat [him] out of his employment contract and the salary, benefits, and other items [defendants] owed him." *Id*. ¶ 55.  He alleges causes of action for (i) wrongful termination, (ii) breach of contract, (iii) breach of the covenant of good faith and fair dealing, (iv) unpaid wages, (v) waiting time penalties, and (vi) conversion.  *Id.* ¶¶ 61–92.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  This standard is not akin to a probability requirement, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

Defendants move to dismiss Roberts's causes of action for (i) wrongful termination, (ii) breach of contract, (iii) breach of the covenant of good faith and fair dealing, (iv) unpaid wages and (v) waiting time penalties.[2]  Dkt. No. 22.  They argue that they were required to

---

[2] Defendants do not move to dismiss Roberts's conversion claim (sixth cause of action).

maintain the certificates of origin pursuant to 19 C.F.R. section 10.1009(c)(1), which governs exports from the United States to Korea, and that since Roberts admits that he ordered the destruction of the certificates, he committed a "material violation of law," which constitutes cause under the employment agreement. They do not address each cause of action in detail individually. Rather, they argue that the causes of action all fail as a matter of law because Roberts was terminated for cause and they therefore had no obligation to pay him earn-out or transition payments. In opposition, Roberts asserts that his conduct did not constitute a "material violation of law," and therefore not "cause" for his termination, because section 10.1009(c)(1) applies to the manufacturer, not defendants. Roberts also argues that any violation did not constitute cause because it was unintentional.

## I. ROBERTS MAY BE ABLE TO ALLEGE THAT § 10.1009(C)(1) DOES NOT APPLY TO DEFENDANTS IN THIS SITUATION

19 C.F.R. section 10.1009 provides that:

> (a) Submission of certification to CBP. Any person who completes and issues a certification for a good exported from the United States to Korea must provide a copy of the certification (written or electronic) to CBP upon request.
>
> (b) Notification of errors in certification. Any person who completes and issues a certification for a good exported from the United States to Korea and who has reason to believe that the certification contains or is based on incorrect information must promptly notify every person to whom the certification was provided of any change that could affect the accuracy or validity of the certification. Notification of an incorrect certification must also be given either in writing or via an authorized electronic data interchange system to CBP specifying the correction (see §§ 10.1032 and 10.1033 of this subpart).
>
> (c) Maintenance of records—
>
>> 1. General. Any person who completes and issues a certification for a good exported from the United States to Korea must maintain, for a period of at least five years after the date the certification was issued, all records and supporting documents relating to the origin of a good for which the certification was issued, including the certification or copies thereof and records and documents associated with:
>>
>>> i. The purchase, cost, and value of, and payment for, the good;

7

      ii. The purchase, cost, and value of, and payment for, all materials, including indirect materials, used in the production of the good; and

      iii. The production of the good in the form in which the good was exported.

   2. Method of maintenance. The records referred to in paragraph (c)(1) of this section must be maintained as provided in § 163.5 of this chapter.

   3. Availability of records. For purposes of determining compliance with the provisions of this part, the records required to be maintained under this section must be stored and made available for examination and inspection by the port director or other appropriate CBP officer in the same manner as provided in Part 163 of this chapter.

19 C.F.R. § 10.1009.

   Roberts argues that section 10.1009(c)(1) applies to manufacturers of goods exported from the United States to Korea, not exporters like defendants, because the manufacturer is the "person who completes and issues" the certification and the certification was prepared on the manufacturer's letterhead and was signed on behalf of the manufacturer. Dkt. No. 23 at 9. Roberts also argues that the information described in subsections (c)(i)-(iii) in most instances is within the manufacturer's possession, not the possession of exporters, such as defendants.

   A review of related regulations and the United States-Korea Free Trade Agreement reveals that section 10.1009 applies to either exporters or producers, depending on which one completes the certificates at issue. Section 10.1009 implements article 6.17.1 of the United States-Korea Free Trade Agreement. *See United States-Korea Free Trade Agreement*, 46 Cust. B. & Dec. 1 (2012), 2012 WL 2339460, at *5. In turn, article 6.17.1 governs recordkeeping of certificates issued pursuant to article 6.15, which provides that importers may receive preferential tariff treatment if they provide a "certification by the importer, exporter, or producer" that the good originates in the other county, i.e., Korea or the United States.[3] Article 6.15.3 provides that "a certification by the *producer or exporter* of the good may be completed on the basis of: (a) the

---

[3] The United States-Korea Free Trade Agreement is available from the Office of the United States Trade Representative at https://ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text.

producer's or exporter's knowledge that the good is originating; or (b) in the case of an exporter, reasonable reliance on the producer's written or electronic certification that the good is originating." (Emphasis added). Article 6.17.1 goes on to state that "an exporter or a producer" that provides a certificate in accordance with article 6.15 shall maintain related records for five years. Those articles make clear that either an exporter or producer (manufacturer) may provide the certificates or origin, and if they do, section 10.1009 requires them to maintain related records for five years. Other regulations implementing the United States-Korea Free Trade Agreement confirm that section 10.1009 applies to either exporter or producers. For example, section 10.1032 provides that "an exporter or producer" that voluntarily provides notification of errors in a certification, pursuant to Section 10.1009(b), will not be subject to penalties. 19 C.F.R. § 10.1032.

Accordingly, the question here is whether defendants or the manufacturer was the entity that "complete[d] and issue[d]" the certifications at issue. 19 C.F.R. § 10.1009(c). Roberts alleges that the certificates bore the manufacturer's letterhead and that the trader (defendants' employee) signed them on behalf of the manufacturer, with the manufacturer's consent. *See, e.g.,* Compl. ¶¶ 30-32. Roberts has not alleged, however, that the manufacturer retained a copy of the certificates which the trader allegedly signed on its behalf. His argument that section 10.1009(c)(1) applied to the manufacturer, not defendants, would be bolstered by allegations that the manufacturer retained copies of the certificates. If the manufacturer did retain copies, it is possible that Roberts did not violate section 10.1009(c)(1), or, if he did, that any violation was not material. If he has a factual basis on which to do so, Roberts may amend his complaint to allege that the manufacturer retained copies of the certificates which he ordered destroyed.

## II. ROBERTS MAY AMEND HIS COMPLAINT TO ALLEGE THAT HE DID NOT ORDER THE DESTRUCTION OF ALL THE COPIES OF THE CERTIFICATES

Roberts argues that "the complaint and motion [to dismiss] do not include any facts or support any inferences that the copies destroyed were the only copies available." Dkt. No. 23 at 9-10. He contends that "if necessary, the complaint can be amended to allege that Roberts never intended that all available copies be destroyed, that available copies existed on the Companies' own servers, and that the Companies were well aware of these copies because Roberts discussed

9

them with Becker [his supervisor] in January 2014—i.e., shortly after the destruction instruction and many weeks before the Companies terminated Roberts)." *Id*. at 10.

As drafted, the complaint does not support the inference that additional copies were available. *See, e.g.,* Compl. ¶ 45 (Roberts instructed the trader "to shred any hard copies [of the certificates] in the contract files" and "to delete any electronic copies found on Trader's personal computer" in order to "get rid" of the certificates"). However, Roberts may amend the complaint to allege that copies remained and that he told defendants about the remaining copies in January 2014. A showing that defendants retained copies of the certificates may show that Roberts did not violate section 10.1009(c)(1), or, if he did, that any violation was not material.

### III.   MATERIAL VIOLATIONS OF LAW CONSTITUTE "CAUSE," WHETHER INTENTIONAL OR UNINTENTIONAL

Roberts's employment agreement provides that "cause" includes "an act of fraud, embezzlement, theft or *any other material violation of law* that occurs during or in the course of your employment with company." Compl. ¶ 58(i) (emphasis added). Roberts argues that the violation of law must be intentional to constitute cause, because it follows the references to fraud, embezzlement, theft, which are all intentional acts. Dkt. No. 23 at 10. But as defendants rightfully point out, the agreement does not state "*intentional* material violation of law" and I cannot read the word into the contract when it has been omitted. *See Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1385-86 (2012), *as modified on denial of reh'g* (Feb. 24, 2012) (rejecting plaintiff's interpretation of contract on motion to dismiss where "[s]uch an interpretation would violate the well-established principle that, when construing an instrument, courts may not insert what has been omitted, or omit what has been inserted") (internal punctuation, alterations, and citations omitted). Accordingly, I reject Robert's argument that only an *intentional* material violation of law constitutes cause.

### IV.   BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

The California Supreme Court instructs that the covenant of good faith and fair dealing prevents an employer from acting in bad faith to frustrate an employment contract's actual benefits. *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 353 n.18 (Cal. 2000). For example, "the

10

covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned." *Id*.; *see also McCollum v. XCare.net, Inc*., 212 F.Supp.2d 1142, 1153 (N.D. Cal. 2002) (denying defendant's motion for summary judgment on claim for breach of the covenant of good faith and fair dealing where jury could conclude that defendant intended to frustrate plaintiff's legitimate expectations of entitlement to a commission by reassigning an account on which plaintiff had worked and/or terminating her employment less than two weeks before the contract related to the account was signed). Accordingly, even if Roberts's conduct otherwise constitutes "cause", defendants may be liable for violation of the implied covenant of good faith and fair dealing if his "for cause" termination was a mere pretext to cheat him out of benefits already earned, such as the transition or performance-based earn-out payments at issue here. The parties did not explicitly raise this issue in their briefing and I do not rule on it at this stage. I note the issue to inform the pleadings and briefing going forward.

## CONCLUSION

Defendants' motion to dismiss is GRANTED. Roberts's complaint is DISMISSED WITH LEAVE TO AMEND. Any amended complaint must be filed within 20 days of this order. Nothing in this order should be taken as a determination that Roberts can plausibly allege any of the causes of action dismissed. As defendants reminded Roberts at the hearing, allegations that are inconsistent with the complaint and plaintiff's briefing to date may be struck.

**IT IS SO ORDERED**.

Dated: May 13, 2015

WILLIAM H. ORRICK
United States District Judge