UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRETT ROBERTS,<br><br>    Plaintiff,<br><br>    v.<br><br>DAYMON WORLDWIDE INC., et al.,<br><br>    Defendants. | Case No. 15-cv-00774-WHO<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 73, 74, 76, 82, 83 |

## INTRODUCTION

Defendants Daymon Worldwide Inc. and Omni Global Sourcing Solutions, Inc. terminated plaintiff Brett Roberts for ordering the destruction of certain export-related documents, which they claim violated multiple provisions of his employment agreement and warranted termination "for cause." Roberts contends that defendants fired him to avoid paying transition and earn-out payments to which he was entitled upon termination other than for "cause," and that the proffered justifications are simply pretextual. In addition, Roberts alleges that defendants have intentionally interfered with his right to possess company tax records and receipts and misrepresented his ability to participate in certain Daymon benefit plans.

There are no material facts in dispute. Roberts did violate his employment contract by committing a "material violation of the law" and has not met his burden to establish that defendants' justification for his termination was pretextual, defendants are entitled to judgment on Roberts's wrongful termination, breach of contract, breach of the covenant of good faith and fair dealing, unpaid wages, and waiting time penalties claims. Nor has Roberts demonstrated personal ownership of the records in Daymon's possession; his conversion claim has no merit. Finally, the contracts Roberts signed with Daymon are fully integrated and preclude his misrepresentation claims. Accordingly, I GRANT defendants' motion for summary judgment on all causes of

action.

**BACKGROUND**

Roberts founded Omni Pacific, a business importing and exporting food and beverages, in 1989. Roberts Depo. at 25:3-4, 65:9-11 [Dkt. Nos. 73-2; 75-2]. He was the President, CEO, Secretary, and Treasurer of Omni Pacific as well as owner. He considered his job to be "everything from janitor to parking lot attendant to salesperson to chief risk officer, chief financial officer, you name it." *Id*. at 32:17-19.

Omni Pacific employed sales employees, known as "traders," who were responsible for buying and selling food and beverage products. *Id*. at 51:18-25. Omni Pacific's policies provided that each sale should be reflected in a file containing a signed purchase order from the customer on the customer's letterhead and a signed sales contract from Omni Pacific, each reflecting the same terms and agreements. *Id.* at 77:7-78:1, 81:21-82:2. In addition, depending on the requirements of the sale, Certificates of Origin ("COOs") were added to the file. A COO certifies the origin of the good. *Id*. at 88:18. The importance of COOs varied depending on the customer, but it could affect whether the product could be imported or aid in determining the applicable duty or tariff. *Id*. at 88:20-89:3. For example, as relevant to this case, under the United States/Korean Free Trade Agreement ("KORUS"), having a COO showing that the goods originated in the United States could have an impact on whether the Korean customer has to pay a duty or tariff for the importation of the goods. *Id*. at 92:4-22.

In mid-2009, Roberts hired a third party to help him sell Omni Pacific. *Id*. at 111:5-112:7. Roberts commenced discussion with Daymon in summer 2010, but the discussions were temporarily put on hold due to changes in Daymon's management. *Id*. at 113:18-21, 115:15-117:4. The parties ultimately signed a Letter of Intent on January 5, 2012 and the acquisition closed approximately eight months later on August 15, 2012. *Id*. at 126:4-7. The acquisition consisted of several different agreements including: (i) a Goodwill Purchase Agreement in which Daymon agreed to pay Roberts $200,000 in cash and up to $700,00 in earn-out payments over six years; (ii) an Asset Purchase Agreement in which both Roberts and Omni Pacific agreed to sell certain assets, properties, and rights to Daymon in exchange for the purchase price; (iii) an

1   Employment Agreement between Daymon and Roberts in which Daymon agreed to hire Roberts
2   as a Senior Vice President at a base compensation of $175,000 with up to another 40% in bonuses,
3   full benefits, car allowance, and twelve months of base salary in possible transition payments.
4         The agreements also provided that Roberts would not be entitled to either the transition
5   payments or further earn-out payments if he was terminated for "cause" as defined by his
6   Employment Agreement. *Id*. at 196:11-15; *see also* section 2(a)(ii)(C) of Goodwill Purchase
7   Agreement. The Employment Agreement, which Roberts signed, defines "cause" to mean: (i) "an
8   act of fraud, embezzlement, theft, or any other material violation of law that occurs during or in
9   the course of [plaintiff's] employment with company;" (ii) "intentional damages to companies
10  [sic] assets;" (iii) "intentional breach of any of company's policies;" (iv) "willful conduct by you
11  that is demonstrably and materially injurious to company, monetarily or otherwise." Roberts
12  Depo., Exh. 21. "Cause also includes any of the above grounds for dismissal regardless of
13  whether the company learns of it before or after terminating [plaintiff's] employment." *Id*.
14        In January 2014, Daymon commenced an outside compliance audit of its trading
15  department, which included Omni Pacific's former import/export business. Over two days, the
16  auditors interviewed Daymon employees and reviewed records. Roberts Depo. at 230:16-240:11.
17  During a meeting on the third day, the auditors informed Roberts they had identified three
18  "mistakes." *Id*. at 239:13-15. The third mistake involved COOs that Jim Duffy, a Daymon
19  employee who previously worked for Omni Pacific, had signed. *Id*. at 240:7-11. The COOs were
20  on the letterhead of a customer, ConAgra; Duffy signed them immediately above a line that stated
21  "ConAgra Grocery Products Company." *Id*. at 243:5-9. Duffy testified that in some cases he
22  signed the COOs on behalf of ConAgra for the sake of expediency. Duffy Depo. at 66:2-12. He
23  admitted that Omni Pacific had to abide by certain quotas for sales in Korea and that if he had
24  requested too many COOs from ConAgra, ConAgra's Korean agent would have been alerted that
25  "too much" was coming in from Omni. *Id*. at 93:18-94:5.
26        Roberts testified that the audit team lawyers, and the other people present at the meeting,
27  did not give him any recommendation or advice on how to handle the mistake. Roberts Depo. at
28  248:4-5. Roberts told them that he would "take care" of all three issues the following day. *Id*. at

248:16-20.

The next day, Roberts met with Duffy and told him:

> I want you to go through every one of those contract files back there, both before and after the sale. I want you to pull them out. I want you to take out the [COO] in there, and I want you to shred it, and I want you to delete it out of your personal computer at the same time.

*Id*. at 258:11-17. Despite his specific instruction to destroy the electronic PDF copies of the COOs, Roberts believed that copies could be retrieved from the company's servers and "backup drives." Roberts Decl. ¶ 58. Roberts told Duffy to accomplish this task on a Saturday afternoon as a form of "punishment." Roberts Depo. at 259:8-15.

Duffy did as directed and informed Roberts on the following Monday that he had followed Roberts's instructions. The same day, Roberts told Larry Becker and Cindy Cheng, both Daymon employees, that he had instructed Duffy to delete and shred the COOs. *Id*. at 264:18-265:12. They were "silent" and said they would check with the audit team regarding Roberts's conduct. *Id*. at 265:18- 166:10.

Approximately three months later, on March 10, 2014 Daymon terminated Roberts. Roberts was told that he was being terminated for "violating [the] company['s] document-retention policy." *Id*. at 349:19-23.

Roberts filed this lawsuit on February 19, 2015. The operative complaint encompasses eight claims: (1) wrongful termination in violation of public policy; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) unpaid wages; (5) waiting time penalties; (6) conversion; (7) intentional misrepresentation; and (8) negligent misrepresentation. Second Amended Complaint ("SAC") [Dkt. No. 57]. Roberts alleges that Daymon breached the Employment Agreement by terminating him without "cause" and failing to pay him the transition and earn-out payments he was owed upon termination other than for "cause." *Id*. ¶¶ 73-79. He asserts that the pretextual for "cause" termination was intended to "cheat [him] out of his employment contract and the salary, benefits and other items they owed him." *Id*. ¶ 57. According to Roberts, this conduct not only violated the terms of the Employment Agreement, but also constituted wrongful termination and a breach of the covenant of good faith and fair dealing.

*Id*. ¶¶ 68-70, 83. Roberts also alleges that defendants have intentionally and substantially interfered with his right to possess "personal company tax records and receipts." *Id*. ¶ 95. Lastly, he claims that defendants misrepresented his eligibility to participate in the 401(k) Profit Sharing Plan and the Employee Stock Ownership Plan. *Id*. ¶¶ 100-114.

Defendants filed a motion for summary judgment on all eight claims. I held a hearing on June 22, 2016.

## LEGAL STANDARD

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing that a material factual issue remains for trial. *Id.* The nonmoving party may not rest on mere allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the record" demonstrating the presence of a material factual dispute. Fed. R. Civ. P. 56(c)(1)(A). The nonmoving party need not show that the issue will be conclusively resolved in its favor. *See Anderson*, 477 U.S. at 248-49. All that is required is the identification of sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (internal quotation marks omitted). If the nonmoving party cannot produce such evidence, the movant "is entitled to...judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323.

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the

1   evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a
2   judge." *Id.* However, conclusory and speculative testimony does not raise a genuine dispute and
3   is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594
4   F.2d 730, 738-39 (9th Cir. 1979).

**DISCUSSION**

Defendants' motion for summary judgment involves four primary questions: (1) Was Roberts terminated for cause? (2) If so, was the "for cause" termination simply pretext to avoid paying him earn-out and other transition benefits? (3) Does Roberts have ownership over the "tax receipts and records" at issue in his conversion claim? and (4) Are the alleged negligent and intentional misrepresentations contradicted by the express terms of Roberts's employment agreement? I answer each question in turn.

## I.   TERMINATION FOR CAUSE

Defendants assert that Roberts's termination violates four independent categories of cause under his employment agreement: (i) "an act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the court of your employment with the company;" (ii) "intentional damage to companies [sic] assets;" (iii) "intentional breach of any company's policies;" (iv) "willful conduct by you that is demonstrably and materially injurious to company, monetarily or otherwise." Roberts Depo., Exh. 21. Because I conclude Roberts's conduct constitutes a material violation of the law, I do not address the remaining provisions.

Under California law, contract interpretation is a question of law for the court's determination. *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965). "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). Such intent should be inferred, if possible, from the written provisions of the contract. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). In interpreting a particular provision, a court must give terms their "ordinary and popular sense." *Id.* A contract provision is considered ambiguous when the provision is susceptible to more than one reasonable interpretation. *MacKinnon*, 31 Cal. 4th at 648. However, the "mere fact that a word or phrase in a [contract] may

6

have multiple meanings does not create an ambiguity." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1118 (1999).

The Employment Agreement defines "cause" in part as "any material violation of the law." Roberts Depo., Exh. 21. Defendants argue Roberts violated three different trade regulations by ordering Duffy to destroy the COOs: (i) The KORUS-specific regulation of 19 C.F.R. § 10.1009(c) which requires "Any person who completes and issues a certification for a good exported from the United States to Korea must maintain, for a period of at least five years after the date the certification was issued, all records and supporting documents relating to the origin of a good from which the certification was issued, including the certification or copies thereof and [certain] records and documents;" (ii) The Foreign Trade Regulation of 15 C.F.R. § 30.10 which reads "All Parties to the export transaction (owners and operators of export carriers, USPPIs, FPPIs, and/or authorized agents) shall retain documents pertaining to the export shipment for five years from the date of export;" (iii) The Export Administration Regulation ("EAR") of 15 C.F.R. § 726.6 which requires "All records required to be kept by the EAR must be retained for five years from the latest of the following times: (1) The export from the United States of the item involved in the transaction to which the records pertain." Mot. at 11 [Dkt. No. 73]. They contend that all three of these regulations required Daymon to retain the COOs for a five year period. They assert that Roberts violated these regulations when he instructed Duffy to destroy the COOs Duffy had signed on behalf of ConAgra, some of which were less than five years old.

Roberts does not dispute the applicability of these three regulations but argues that his actions did not constitute a *material* violation of the law, as required under the Employment Agreement. Oppo. at 10 [Dkt. No. 75].[1] He contends that the applicable penalty statute, 19 C.F.R. § 163.6, applies only to failure to produce the records in response to a request from customs and that, except in limited circumstances that are not relevant here, the producing party is

---

[1] Roberts does not otherwise contend that term "material" should not be interpreted based on its plain meaning – having significance or relevancy. *See* Oxford English Dictionary, Online (www.oed.com) (accessed July 20, 2016) (defining material as "having significance or relevance."); *see also People v. Lucas*, 60 Cal. 4th 153, 293 (2014) (holding that the "ordinary meaning" of material is "substantial, essential, relevant or pertinent").

7

given 30 days to produce the records. *Id*. (citing 19 C.F.R. § 163.6(a),(b)).  Therefore, because it was "extremely unlikely" that customs would ever have requested the destroyed COOs and defendants could have avoided any potential penalties by contacting ConAgra and requesting copies of the COOs, there was no material violation.  *Id*.

But 19 C.F.R. § 163.6 is not the only penalty provision at issue.  19 C.F.R. § 163.6 relates to a party's obligations under the KORUS.  Defendants argue that Roberts's conduct also violated the penalty provision of the EAR, 15 C.F.R. § 764.2(i).  Under this section, "No person may fail or refuse to comply with any reporting or record keeping requirement of the EAR or of any order, license or authorization issued thereunder."  15 C.F.R. § 764.2(i).  Violations may be subject to administrative and other sanctions.  15 C.F.R. § 764.3.

Roberts contends that because defendants could have attained copies of the destroyed COOs, they are not out of compliance with EAR requirements.  But Roberts's belief that defendants can obtain copies from ConAgra is merely conjecture.  Roberts had the opportunity to conduct discovery in this case, yet his representation is supported only by a citation to his own declaration and the KORUS, which states that both parties have an obligation to maintain the records.  He did not establish that ConAgra has copies of the COOs, let alone that ConAgra would be willing to provide defendants with copies.[2]  Defendants assert that it is not guaranteed that ConAgra has copies since Duffy testified that he did not always send hard copies of COOs to customers.  Duffy Depo. at 80:19-23.  Where Duffy was intending, in part, to avoid detection by ConAgra that a high volume of sales were being made in Korea, defendants plausibly suggest that it is likely that Duffy did not send hard copies to ConAgra.  *Id*. at 92:19-97:5.

Furthermore, even if photocopies were obtained, Roberts's opposition brief does not address whether defendants would be in compliance with EAR regulations regarding the use of reproductions.[3]  Under the EAR, a regulated person[4] may maintain reproductions instead of the

---

[2] Roberts's first motion for an extension of time to file the McCollum Declaration is GRANTED. Dkt. No. 76.  However, despite securing a declaration from a regional manager at ConAgra, the declaration does not address whether or not ConAgra has retained copies of the destroyed COOs or if it would be able or willing to provide Daymon with copies.

[3] Roberts's second motion for extension of time to file the Further Declaration of Brett Roberts, submitted after the hearing, is DENIED.  Dkt. No. 83.  Even if the further declaration had been

original records provided that all of the requirements of that section have been met. 15 C.F.R. § 762.5(d) (explaining that for "systems based on photographic, photostatic, or miniature photographic processes, the regulated person must maintain a detailed index of all records in the system that is arranged in such a manner as to allow immediate location of any particular record in the system"). Defendants' expert, Denise Walker, explains that "if the electronic copies are not the typical storage method and the documents are not easily retrievable, then Daymon was out of compliance with the import or export regulations for recordkeeping." Therefore, "[e]ven had Daymon been able to obtain electronic copies of all of the COOS at issue, Daymon was out of compliance with [15 C.F.R. 762.2] because the COOs were not easily retrievable and were not stored in a typical method" as required by the EAR. Walker Decl. ¶ 58. Roberts offers no countering expert declaration or explanation grounded in the statutory language of how Daymon would be in compliance even if it were to obtain the photocopies.[5]

Accordingly, Roberts has not cited or produced any evidence of a material dispute that would avoid a finding that his actions constituted a material violation of the law pursuant to his employment agreement.

## II.     PRETEXTUAL TERMINATION

Roberts asserts that even if his conduct otherwise constituted "cause" under the employment agreement, his "for cause" termination was "mere pretext to cheat him out of benefits

---

considered, it would not have changed the outcome of this Order. Roberts's related motion to seal, Dkt. No. 82, is GRANTED in accordance with the Declaration of Kim Colbert, Dkt. No. 86.
[4] The regulations defines regulated person as: "Any person subject to the jurisdiction of the United States who, as principal or agent (including a forwarding agent), participates in any transaction described in paragraph (a) of this section, and any person in the United States or abroad who is required to make and maintain records under any provision of the EAR, shall keep and maintain all records described in § 762.2 of this part that are made or obtained by that person and shall produce them in a manner provided by § 762.7 of this part." 15 C.F.R. § 762.1(b). Paragraph (a) of the section describes transactions as including those of: "Exports of commodities, software, or technology from the United States" 15 C.F.R. § 762.1(a).
[5] Roberts originally requested that if I determined that Walker's report supports defendants' motion for summary judgment, I should deny the motion or defer consideration until he had a "reasonable opportunity" to brief her deposition transcript. Travis Decl. ¶ 14. Despite his failure to file any documents related to Walker's declaration or report prior to the hearing, Roberts made representations during oral argument that Walker's deposition revealed significant inconsistencies between her testimony and her report. Although I allowed Roberts to file Walker's deposition transcript after the hearing, the transcription reveals none of the claimed substantial contradictions.

9

already earned (the transition payments and the performance-based earn-out payments)." Oppo. at 14. Defendants argue that Roberts has failed to establish a material dispute as to pretext. I agree with defendants.[6]

Public policy wrongful termination claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[7] *See Nielsen v. Trofholz Techs., Inc.,* 750 F. Supp. 2d 1157, 1164 (E.D. Cal. 2010), *aff'd,* 470 F. App'x 647 (9th Cir. 2012). Under this framework, a plaintiff must establish a prima facie case by showing: (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) a causal link between the protected activity and the employer's action. *Id*. The employer then must present evidence that it had a legitimate reason for its action. If the employer does so, the burden then shifts to the plaintiff to prove that the employer's proffered reasons were pretextual. *Id*.

Even if Roberts could establish a prima facie case, he has not garnered sufficient evidence to establish pretext. To prove pretext, the employee must show that "the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge." *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999). When the parties have had the benefit of discovery, as they have in this case, to avert summary judgment an employee "must produce substantial responsive evidence that the employer's showing was untrue or pretextual." *Martin v. Lockheed Missiles & Space Co*., 29 Cal. App. 4th 1718, 1735 (1994) (internal quotation marks and citation omitted). Roberts has not done so.[8]

A central problem with Roberts's pretext argument is that he cites no evidence that he was

---

[6] Although the parties' pretext arguments focus on the wrongful termination and the breach of the covenant of good faith and fair dealing claims, whether the termination was pretextual is obviously relevant to Roberts's breach of contract, unpaid wages, and waiting time penalties claims.

[7] This framework derives its name from the Supreme Court decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 797 (1973).

[8] Robert's inability to demonstrate pretext also fatally undermines his breach of the implied covenant of good faith and fair dealing claim, since it is based on the same facts as his assertion of pretext. *See Guz v. Bechtel Nat. Inc*., 24 Cal. 4th 317, 353 n.18, (2000) ("[T]he covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned.").

10

terminated for financial reasons. Instead, he offers his own declaration that, notwithstanding his success at Daymon, he was frustrated with its human resources and legal departments and lodged a "series of complaints, written and oral" primarily through his immediate supervisors. Roberts Decl. ¶¶ 16, 20 [Dkt. No. 75-18]. The complaints encompassed a wide variety of topics, from Roberts's concerns regarding his annual raise in 2013 to the turn-around time for documents from the legal department. *Id*. ¶ 20. He states that although initially defendants were "receptive and responsive" to his concerns, their responses took on an "increasingly dismissive and annoyed tone." *Id*. ¶ 21.

As evidence of defendants' annoyance, he relies primarily on two email chains involving Clint Sollenberger, Daymon's Human Resources Director. The first email chain involves the approval of a request to fill an account representative position. Sollenberger Depo. [Dkt. No. 75-5], Exh. 15. [9] In response to what seemed to him to be an inefficient hiring process, Roberts sent out an email stating that "we seem to trip over ourselves with processes and procedures which triumph actual results." *Id*. He asked "politely and respectfully how do we get past this tomorrow and move a[n] urgently needed replacement hire process forward." *Id*. The next day, Sollenberger sent an email to Larry Becker, Roberts's supervisor, expressing his view that Roberts's emails are "generally rude and antagonistic" and that Becker should "start coaching him to get with the program." *Id*.

The second email chain was initiated in February 2014 by Amy Holgerson, a Daymon Human Resources employee, regarding the hiring of two temporary employees. Sollenberger Depo., Exh. 13. Roberts explains in his declaration that he was having trouble getting defendants to pay for the temporary employees and that the temp agency would not pay the employees in a manner Roberts thought appropriate. Roberts Decl. ¶ 27. After a phone call with a representative from the temp agency, Roberts sent an email that expressed his view that either of the two options presented by the agency were "utterly useless and unacceptable" and requested to drop the agency and "find another service in which [sic] to handle this matter." Sollenberger Depo., Exh. 13. This

---

[9] The request to seal a portion of Travis's Declaration and six of the attached declarations is GRANTED. Dkt. No. 74.

11

email chain was forwarded on to Sollenberger who responded that, "[t]his is yet another case of rude, inappropriate and unprofessional behavior from [Roberts]. It's bad enough that he behaves terribly with our own associates but treating external partners badly who are just trying to help rectify a situation reflects poorly on the whole Company." Sollenberger Depo., Exh. 14. Roberts argues that these two emails demonstrate that Sollenberger was already "boiling" as to Roberts in October 2013 and that he had completely "boiled over" by February 2014. Oppo. at 18.[10]

Roberts takes issue with the accuracy of Sollenberger's identified reasons for his termination. Roberts states that Sollenberger, who terminated Roberts, told him that he was being terminated for "cause" for violating the company's document retention policy by instructing Duffy to destroy the COOs. Roberts Decl. ¶ 69. But when Sollenberger was asked at his deposition which provisions of the employee handbook Roberts violated, he could only identify a provision that prohibits "[f]alsification of company documents" and testified that Roberts indirectly violated it because Duffy falsified the COOs on Roberts's "watch." Sollenberger Depo. 76:21-78:12, 96:12-98:3. Roberts asserts that this reasoning is insufficient to hold him responsible for what was ultimately Duffy's behavior.

In addition, when Sollenberger was asked which provisions of the Global Code of Conduct Roberts violated, Sollenberger pointed to the "Books and Recordkeeping" provision. This section provides: "Each associate is accountable for doing his or her part to ensure all financial books, records and account accurately reflect transactions and events that conform to internal and external accounting standard." Sollenberger Depo. Exh. 19. Roberts asserts that the COOs were not financial books, records, or accounts and that Sollenberger could not demonstrate that the Books and Recordkeeping provision required the maintenance of a record known to be false.

After construing all reasonable inferences in a light most favorable to Roberts, I cannot find a genuine dispute of material fact regarding pretext. There is no direct evidence of pretext.

---

[10] The February 2014 email chain followed a visit by Daymon's Chief Financial Officer and Chief Customer Officer Rhonda Levine who gave the human resources department an "earful" about its problems. Roberts Decl. ¶¶ 30,31. Becker told Roberts this visit was a "bloodbath" for the human resources department. *Id.* ¶ 32.

1    Roberts's arguments depend upon inferences from circumstantial evidence that fail to suggest a
2    causal relationship between Sollenberger's views and Roberts's theory that he was terminated in
3    order to avoid the payment of his promised benefits.
4    　　　　Roberts's theory suffers from multiple fatal flaws.  First, Roberts fails to connect
5    Sollenberger's comments to what Roberts believes was the true reason for his termination – saving
6    money by avoiding benefits payouts.  *See Mattsson v. Home Depot, Inc.*, No. 11-cv-0533, 2012
7    WL 2342948, at *4 (S.D. Cal. June 20, 2012) ("Mere assertions that an employer had a
8    discriminatory motive and intent are inadequate, without substantial factual evidence, to raise a
9    genuine issue of material fact as to pretext in order to avoid summary judgment.") (modification
10   and citation omitted).  Roberts points to no evidence, direct or circumstantial, in which monetary
11   concerns are discussed.  The record is devoid of any of defendants' officers making even an off-
12   hand comment concerning the amount of Roberts's pay-out.  The primary evidence Roberts
13   provides shows only that one individual involved in his termination had previously commented
14   about his rude and unprofessional behavior.  But there is no link between Sollenberger's views
15   and Daymon's purported desire to deny Roberts transition or earn-out payments.[11]
16   　　　　Second, the record does not show that key decision makers involved in Roberts's
17   termination even knew of his HR-related complaints.  Kim Colbert, who "ultimately made the
18   recommendation to the human resources department that [Roberts's] employment should be
19   terminated," "was not aware of any of the complaints that [Roberts] describes in his Complaint
20   with regards to the Daymon Human Resource and Legal divisions."  Colbert Decl. ¶¶ 7,9 [Dkt.
21   No. 73-11].  Other individuals testified they were similarly unaware that Roberts had made
22   complaints or that Daymon was planning on terminating Roberts based on these complaints.  *See*
23   Mervis Depo. at 71:23-72:4 [Dkt. No. 73-6]; Rogers Depo. at 71:16-20 [Dkt. No. 73-7]; Marklay
24   Depo. at 6:4-7 [Dkt. No. 73-5].
25   　　　　Third, Roberts was not the only individual terminated as a result of the destruction of the
26   COOs.  Defendants terminated Duffy for the same reason.  *See* Sollenberger Depo., Exh. 20.  If

---

[11] Indeed, Daymon argued at the hearing that terminating Roberts, one of its most valuable employees, was against its economic interest.

1  defendants' justification for firing Roberts was mere pretext to deny him his earn-out benefits,
2  why would they fire Duffy, who did not stand to gain any bonuses or earn-out payments, for the
3  same reason? Roberts provides no explanation.

4  Because Roberts cannot demonstrate that his for "cause" termination was pretextual, he
5  cannot prevail on his claims for breach of contract, wrongful termination, unpaid wages, waiting
6  time penalties, or breach of the implied covenant of good faith and fair dealing. *See Patterson v.*
7  *Int'l Bhd. of Teamsters, Local 959*, 121 F.3d 1345, 1350 (9th Cir. 1997) (A plaintiff must produce
8  more than a "mere scintilla" of evidence to avoid summary judgment.). Defendants' motion for
9  summary judgment on these claims is GRANTED.

**III.  CONVERSION**

Roberts alleges that he has a right to possess his "valuable personal company tax records and receipts" that defendants maintain in a locked storage room. SAC ¶ 95. He claims that defendants "intentionally and substantially interfered" with his property by "taking possession of those records and refusing to return them to Roberts even though Roberts demanded their return." *Id.* ¶ 96.

To state a claim for conversion, a plaintiff must demonstrate that: "(1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 119 (2007). Defendants argue that they are entitled to summary judgment because: (1) Roberts cannot show that he has personal ownership or the right to possess the "tax records and receipts" he claims Daymon converted; (2) Roberts cannot show that Daymon disposed of the property in a manner inconsistent with his property rights; (3) Roberts cannot show he was damaged.

The Asset Purchase Agreement defines the "Seller" as Omni Pacific Company, Inc. and the "Seller Principal" as Brett Roberts, an individual. Roberts Depo., Exh. 19. Under the agreement, the Seller retained its rights to the company's tax returns. Roberts argues that because Omni Pacific is an "S" corporation and the business has been dissolved, it functions as a "pass through" entity for tax purposes and Roberts "effectively *is* Omni Pacific." Oppo. at 23.

14

Under the general principles of contract interpretation, "when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000). "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *California Dairies Inc. v. RSUI Indem. Co.*, 617 F. Supp. 2d 1023, 1031 (E.D. Cal. 2009) (citation omitted). Assuming the truth of Roberts's representations, Roberts has not shown why or how Omni Pacific's potential tax status is relevant to the interpretation of the Asset Purchase Agreement.

First, there is no mention of the Seller Principal's rights to the tax returns in the agreement. Reading the contract as Roberts does makes the distinction between the Seller and Seller Principal obsolete and, therefore, contrary to basic contract interpretation principles. *See Chaly-Garcia v. United States*, 508 F.3d 1201, 1204 (9th Cir. 2007) ("Under federal common law, we presume that every provision was intended to accomplish some purpose, and that none are deemed superfluous.") (internal quotation marks and citations omitted).

Second, the Asset Purchase Agreement refers only to "tax returns," while Roberts claims ownership of the broader category of "tax records and receipts" which he defines as including all receipts from "invoices, customers, suppliers, [and] vendors." *See* Roberts Depo. at 321:15-23 (defining "tax receipts" as "[e]verything the IRS would ask for in an audit, that's a tax receipt that substantiates the numbers you put on your tax return. Those tax receipts that are in that [sic] boxes – that's invoices, customers, suppliers, vendors – those are the tax receipts of the business."). Roberts points to no provision of the contract, or any other evidence, that encompasses this extensive set of documents. In fact, the Asset Purchase Agreement provides specifically that all of Omni Pacific's financial books and records relating to the business since its inception were part of the assets Daymon purchased. Roberts Depo., Exh. 19.[12]

Roberts has not provided any evidence or plausible interpretation of the Asset Purchase Agreement that might establish his personal ownership rights over the documents in question. Defendants' motion for summary judgment on this claim is GRANTED.

---

[12] It is worth noting that Daymon has allowed Roberts access to records necessary to respond to IRS inquiries. Roberts Depo. at 330:7-21.

## IV. INTENTIONAL AND NEGLIGENT MISREPRESENTATION

Roberts's seventh and eighth claims encompass allegations that defendants falsely represented to him that he "would be eligible to start participating in the Daymon Worldwide Inc. 401(k) Profit Sharing Plan ["401(k) Plan"] and the Daymon Worldwide Inc. Employee Stock Ownership Plan ["ESOP"] beginning January 1, 2013." SAC ¶ 101.  However, "Roberts was not allowed to participate in the Plan until at least its subsequent enrollment period, July 1, 2013, and [] he was never allowed to participate in the ESOP." *Id.* ¶ 107.

The elements of intentional misrepresentation in California are: "(1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230-31 (2013).  The elements of negligent misrepresentation are similar except that a negligent misrepresentation claim does not require knowledge of falsity but instead requires "a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true." *Id.* at 231; *see also Charnay v. Cobert*, 145 Cal. App. 4th 170, 184 (2006).

Roberts's allegations are contradicted by the unambiguous written terms of the Employment Agreement that he signed with Daymon. The Employment Agreement provides that: "As with any [Daymon] benefit plans these may be subject to change at any time." Roberts Depo., Exh. 21. The agreement further states: "[n]o changes to this Agreement shall be valid unless contained in a written agreement signed by the Chief Human Resources Officer of Daymon." *Id*. By signing the agreement, Roberts agreed that he had not "relied on any representations, promises, or agreements of any kind made to [him] in connection with [his] decision to accept employment with [Daymon] other than those outlined in this offer letter." *Id.*

Roberts opposes defendants' position because neither the 401(k) Plan nor the ESOP is specifically mentioned in the Employment Agreement. But the contract does refer to "benefit plans." Roberts provides no reason to exclude the 401(k) Plan or the ESOP from the definition of "benefit plans;" in fact, he refers to them as "benefits programs" repeatedly in his complaint. SAC ¶¶ 104 ("Daymon's benefits programs (including the [401(k)] Plan and ESOP)"), 110 (same).

Roberts also makes the unpersuasive argument that the "no reliance" provision of the

16

1  Employment Agreement is inapplicable because he relied on the representations for the purposes
2  of selling his business, not in his decision to accept employment.  The purpose of an integration
3  clause is to prevent precisely this type of argument.  Both the Asset Purchase Agreement and the
4  Goodwill Purchase Agreement are fully integrated agreements.  Roberts Depo., Exh. 18 ("This
5  Agreement contains the entire understanding of the parties hereto with respect to the subject
6  matter herein contained, and all pre-existing agreements between the parties hereto shall become
7  part of and are hereby merged into this Agreement.  There are no restrictions, promises,
8  warranties, covenants or undertakings other than those expressly set forth herein or in any
9  schedule and exhibits hereto."); Roberts Depo., Exh. 19 (same).  Roberts cannot claim that he
10 relied on extraneous promises to any of the three agreements in light of the clear intent to have the
11 written agreements embody the entire transaction between the parties.

Defendants' motion for summary judgment on the intentional and negligent misrepresentation claims is GRANTED.

## CONCLUSION

For the above mentioned reasons, defendants' motion for summary judgment is GRANTED and Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED**.

Dated: July 22, 2016



WILLIAM H. ORRICK
United States District Judge

17